**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JAMES J. CUMMINS,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security,<br><br>　　　　　Defendant. | Case No.  2:12-cv-00443-RFB-GWF<br><br>**FINDINGS AND RECOMMENDATION**<br><br>Motion to Reverse (#28); Cross Motion to Affirm (#29); Motion for Reversal (#35); Motion for Reversal (#37); Motion of Understanding (#40) |

　　　　This matter is before the Court on Plaintiff James J. Cummins' Complaint for Review of Final Decision of the Commissioner of Social Security (#3), filed on March 22, 2012.  Defendant's Answer (#17) was filed on May 7, 2013, as was a certified copy of the Administrative Record (the "AR").  *See Notice* (#18).  This matter has been submitted to the undersigned United States Magistrate Judge for Findings and Recommendations on Plaintiff's Motion to Reverse (#28), filed on November 21, 2013.  The Acting Commissioner filed her Cross Motion to Affirm (#29) and Opposition (#30) to Plaintiff's Motion for Reversal on December 20, 2013.  Plaintiff subsequently filed a second Motion for Reversal (#35) on February 13, 2014, third Motion for Reversal Based on New Evidence (#37) on April 18, 2014, and a Motion of Understanding (#40) on July 10, 2014.

**BACKGROUND**

　　　　Plaintiff James J. Cummins, appearing pro se, seeks judicial review of Administrative Law Judge John Heyer's ("ALJ") decision dated May 24, 2011.  *See* Administrative Record ("AR") 20-30.  The issue before the Court is whether the Plaintiff was disabled from his alleged onset date of June 1, 2009 through his date last insured on December 31, 2012.

**A.     Procedural History**

On September 4, 2009, Plaintiff filed a Title II application for a period of disability and disability insurance benefits. On September 9, 2009, Plaintiff filed a Title XVI application for supplemental security income. In both applications, the Plaintiff alleged disability beginning June 1, 2009. AR 20. The application was denied initially and upon administrative reconsideration. *Id.* Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. At a hearing on May 3, 2011, Plaintiff appeared with his wife, Jacqualine Grenier-Cummins, and testified in support of his claim. AR 56. Although informed of the right to representation, Plaintiff chose to appear and testify without the assistance of an attorney or other representative. AR 20, 56-58. Robin Generaux, an impartial vocational expert, also appeared at the hearing. *Id.* In a decision dated May 24, 2011, ALJ John Heyer found Plaintiff was not disabled within the meaning of the SSA. *Id*. Plaintiff timely filed a Request for Review, which was denied by the Appeals Council on August 10, 2011. AR 1. When the Appeals Council declined to review the ALJ's decision, the decision became final. *Id.* Plaintiff then filed this action for judicial review pursuant to 42 U.S.C. 405(g). This matter has been referred to the undersigned for a report of findings and recommendations under 28 U.S.C. §§ 636 (b)(1)(B) and (C).

**B.     Factual History**

  **1.     Hearing Testimony**

Plaintiff James J. Cummins was born on December 5, 1968. AR 61. He was 42 years old at the time of the hearing on May 3, 2011. *Id*. He is 6'4" and weighed 240 pounds. AR 145. Plaintiff indicated that he completed the 11th grade and has had no other formal education or vocational job training. AR 150. He indicated that he is unable to work due to back and neck pain that causes him headaches when he lifts things and a testicular cyst that swells up so he can barely walk. AR 146. He resides in Pahrump, Nevada with his wife. AR 112-113. He described his typical day as taking a shower to try to loosen up his back, feeding the chickens, cleaning up around the property, and taking the dogs for their nightly half mile walk. AR 63-64, 65. He described the property maintenance to include burning weeds, removing mattresses and other debris from the yard, and tending to his garden. AR 64. He indicated that he lifts a two gallon pitcher of water

every day to water the trees, but it pulls the muscles through his neck and shoulders. AR 62-63. He indicated that he helps with the dishes, dusting, laundry, cooking, and accompanies Mrs. Cummins grocery shopping. AR 65.

Regarding recreational activities, Plaintiff stated that he does not go to the movies because he does not like the public. AR 65. When he is unable to sleep, he sometimes plays Club Pogo on the computer. AR 66. He is currently taking Abilify as an antidepressant and indicated that it "does keep [him] kind of stable." AR 66. He indicated that the Abilify does not get rid of his mood swings but it controls his anger. AR 68. He sees a psychiatrist once a month and counselors once a week. AR 66. Plaintiff indicated that he stopped taking Vistaril and Pristiq because they made him worse. AR 69. He reported that once while on Vistaril he almost hit his wife. *Id*.

Plaintiff last worked for ACME, loading grain and feed into customers' vehicles from January to June of 2009. AR 61. He was previously employed as a welder for Interstate Trailer Group building cargo trailers from 2004 to 2006. AR 62. Prior to that he worked as a welder and fabricator for Atlantic Steel Systems from 1995 to approximately 2004. *Id*. Plaintiff indicated that he stopped working in June 2009 because his "back completely gave out" on him. AR 62. When asked what his doctors indicated was wrong with his back, he stated:

> I have a broken L4 vertebrate. I have – I'm not sure if my tailbone is broken off my pelvic bone, but the tailbone itself is broken off of the – or the spine has broken off the tailbone and shifted off, and I'm not sure which way it is offset but it is – my spine has shifted off my tailbone.

AR 62. Plaintiff indicated that Dr. Brady diagnosed him with the broken L4 vertebrae ten years prior and wanted to perform surgery, but Plaintiff "signed out of his office against medical advice." AR 67-68.

At the time of the hearing before ALJ Heyer, Plaintiff was not taking any medication for pain. Mr. Cummins indicated that his doctors wanted him to take Percocet, but he stated that he will not use it because the pills do not help him unless he uses them to excess "where they get [him] all dopey". AR 67. When asked if he was using any illegal drugs, he indicated that he smokes marijuana three times a day for the pain. AR 67. Plaintiff stated that his "reckless youth" and things he did in his past were "catching up with [him]." AR 73.

In response to the vocational expert's testimony, Plaintiff stated that there were no job openings in Pahrump, Nevada, fitting the positions described by Ms. Generaux. AR 71. He indicated that he looks for work in the newspaper and is even considering going back to school to "get into like the computer field or something" so that he could potentially work from home. AR 72. He stated that "what drives me the craziest is not being able to get up and get to work, and I do have mental issues I've had all my life but I think by working it kept me from losing my temper and all of that all the time." *Id*.

### 2.     Medical Records

On October 22, 2008, Plaintiff was transported by EMS Fire-Rescue Services to the Desert View Regional Medical Center in Pahrump, Nevada with complaints of back pain. AR 233. The incident report states, "[f]ound 39 male on floor. PT stated he cannot fill [sic] his L leg or L arm. PT stated he was on his bed and crawled into the living room floor. PT stated he could not walk." AR 233. Plaintiff was examined by Dr. Thai who took x-rays of his lumbar spine. Dr. Thai indicated that Plaintiff had acute myofascial strain of the lumbar spine and released him home in improved and stable condition. AR 228.

On December 4, 2008, Plaintiff presented to Dr. Sherman for an orthopedic examination. AR 221. Physical examination revealed normal gait using no cane, brace or assistive device to ambulate. AR 222. Dr. Sherman stated that "Plaintiff declined to walk on his toes but easily walks on his heels. He performs a normal squatting maneuver complaining of back pain as he performs the maneuver. He easily gains the examining room table but complains of back pain as he sits up from a lying position easily bringing his fingertips to the level of his ankles." AR 22. Examination of the neck and upper extremities revealed a 100% normal, pain-free range of motion of the neck, both shoulders, elbows, wrists and small joints of the hands and fingers with normal grip strength bilaterally and the nerve and circulation in tact to both hands. *Id*. Examination of the spine in the standing position revealed normal contour with a 100% normal range of motion and no muscle spasm or tenderness about the lumbar spine. *Id*. Examination in the sitting position indicated deep tendon reflexes at the knees and ankles, sensation, pedal pulses and straight leg raising within normal limits. AR 223. X-rays of the lumbar spine were normal revealing no osteoarthritis,

osteoporosis or fractures. Dr. Sherman indicated that the intervertebral disc spaces were well-maintained and the lumbar lordosis was normal. *Id*. Dr. Sherman concluded that Plaintiff's complaints of low back pain were without neurologic deficit.

In a consultative examination medical source statement, Dr. Sherman found Plaintiff capable of sitting, standing and walking for six hours during the course of an eight hour day without the assistance of a cane or device to ambulate. AR 219-223. He further stated that Plaintiff could frequently lift 50 pounds and occasionally lift 100 pounds, and has no restrictions regarding forward bending at the waist, squatting, kneeling, pushing, pulling, grasping, or fine manipulation activities with his hands. *Id*. Dr. Sherman indicated that Plaintiff's general appearance appeared well and his behavior was manipulative. AR 220.

On May 24, 2009, Plaintiff was examined by Dr. Wood at the Desert View Regional Medical Center. AR 236. Plaintiff came in with complaints of abdominal pain and vomiting. Dr. Wood's notes indicated that Plaintiff drank five (5) quarts of beer on Thursday, two (2) shots of tequila on Friday, and began vomiting and dry heaving on Saturday and Sunday. AR 239. Examination of Plaintiff revealed normal neck and back inspection. AR 238. Dr. Wood noted tenderness in Plaintiff's right testicle and sharp, radiating pains in his abdomen. *Id.* A CT scan also indicated lumbar spondilosis. AR 238, 245. After completing lab work, Dr. Wood assessed Plaintiff with acute abdominal pain, prescribed Zofran and Lortab and released Plaintiff home in good condition. AR 238.

On May 28, 2009, Plaintiff presented to the emergency department of the Desert View Regional Medical Center and was seen by Dr. Erickson for genital pain. AR 252. Dr. Erickson's initial assessment revealed Plaintiff was alert and in no acute distress. He diagnosed Plaintiff with normal testicles with "few tiny cysts L testicle, normal epididymis, small hydroceles and no tumor." AR 256.

On June 4, 2009, Plaintiff underwent a follow-up testicular ultrasound with Dr. Hughes in the University Medical Center Emergency Room. AR 224. Plaintiff stated that he had pain in the right testicle with some swelling. *Id*. Physical examination showed that the swelling had improved. *Id*. The testicular ultrasound revealed good flow. "It shows bilateral small hydroceles,

right greater than left, a small left testicular cyst and microlithiasis of the left testicle." AR 224. Dr. Hughes recommended Plaintiff continue his medication and schedule a follow-up ultrasound with Urology. AR 224-225.

On October 22, 2009, Plaintiff presented to the emergency department of the Desert View Regional Medical Center with testicular pain. AR 263. Plaintiff's labs were normal. AR 265. Dr. Bibby indicated the presence of mild scrotal swelling and mild hydrocele. AR 265. He diagnosed Plaintiff with Prostasis[1] and Varicocele[2] and prescribed Aleve every twelve hours. AR 265, 273. Plaintiff was discharged home in good and stable condition. *Id.*

On December 18, 2009, Plaintiff presented to Advanced Medical Center with complaints of back pain. AR 279-280. Treatment notes indicated that Plaintiff appeared to be in pain with no signs of acute distress. AR 281. Plaintiff alleged back pain due to multiple traumas including motor vehicle accidents as a young adult in which he was thrown out of the windshield and due to his fall from a cliff. AR 280. Plaintiff stated that he was on Gabapentin and occasionally used muscle relaxers to help him. *Id.* Examination of Plaintiff's musculoskeletal system showed tenderness of the paraspinous muscles. AR 281. It was recommended that Plaintiff begin physical therapy and undergo an x-ray and MRI of his lower spine. *Id.* Plaintiff was given muscle relaxers and referred to a back and spine specialist for further evaluation. *Id.*

On February 11, 2010, Plaintiff underwent x-rays of his cervical spine at Steinberg Diagnostic Medical Imaging Centers. AR 284. X-rays showed a mild to moderate disc space narrowing at L1-L2 and L4-L5. Facet arthropathy was noted asymmetrically on the right L4-L5. AR 285. Dr. Gamino diagnosed Plaintiff with moderate to severe degenerative disc and degenerative joint disease C6-C7 and moderate degenerative disc disease L1-L2 and L4-L5. AR 284-285.

---

[1] A Prostasis is "an inflammation (soreness) of the prostate gland that most often follows a urinary tract infection." AR 273.

[2] A Varicocele is "an enlargement of the grouping of veins above the testicle... It may cause discomfort or pain...This is not a serious condition... It presents more as an inconvenience than as a dangerous growth or condition..." AR 273.

On May 3, 2010, Plaintiff presented to Dr. Sherman for an orthopedic examination. Dr. Sherman again noted that Plaintiff appeared manipulative. AR 291. He also noted Plaintiff's "constant pain complaints". AR 291. He stated that Plaintiff's x-rays revealed mild to moderate disc space narrowing at the L1-2 and L4-5 levels. AR 286. Plaintiff complained of posterior neck pain with aching pain involving both lateral shoulders, the mid dorsal forearms and ring fingers of both hands. *Id*. He claimed weakness of grip in the right hand but normal grip strength in the left hand. *Id*. He also complained of painful limited neck motion with the pain worsening with any pushing, pulling, or lifting weights heavier than 20 pounds. *Id*. Physical examination of Plaintiff revealed normal neck appearance with no muscle spasm and forward flexion and extension at 30 degrees with 70 degree right/left rotation. AR 287. Examination of the spine indicated normal contour with no muscle spasm. AR 288. Plaintiff could forward flex 80 degrees, right/left leans 20 degrees and extends 20 degrees. *Id*. Examination of the upper extremities revealed 100 percent normal, pain-free range of motion of both shoulders, elbows, right wrist and the small joints of both hands. *Id*. Dr. Sherman's impression of Plaintiff was that his cervical spine had moderate to advanced osteoarthritis involving the two lower segments with complaints of neck pain but no neurologic deficit. AR 288. He also stated that Plaintiff has mild disc space narrowing at the L1-2 and L4-5 disc spaces with complaints of low back pain but no neurologic deficit. AR 289. He stated that Plaintiff was capable of sitting, standing and walking for six hours during the course of an eight hour day without the assistance of a cane or device to ambulate. AR 289. He further stated that Plaintiff could frequently lift 25 pounds and occasionally lift 50 pounds, and has no restrictions regarding reaching, pushing, pulling, grasping, or fine manipulation activities with his hands. *Id*.

On May 12, 2010, Lana Long, a state agency adjudicator, completed a Physical Residual Functional Capacity Assessment of Plaintiff. AR 292. Ms. Long found Plaintiff capable of sitting, standing and walking for six hours in an eight hour day, and capable of lifting 50 pounds occasionally and 25 pounds frequently. AR 293. She found no postural, manipulative, visual, communicative, or environmental limitations. AR 295-296. She stated that "[c]laimant's allegations are partially credible, but the degree of limitations he reports is not supported by the

1  objective evidence.  Symptom magnification was noted at the CE." AR 297.

2  On May 21, 2010, Plaintiff presented to Advanced Medical with complaints of back and neck pain.  AR 402.  The record indicated that there was no history of illicit drug use or prescription misuse.  *Id*.  Physical examination of Plaintiff revealed that he was "well developed, well nourished, in no acute distress."  *Id*.  He was assessed with degenerative disc disease and pain in the low back and prescribed Soma.  AR 403.

On July 23, 2010, Plaintiff presented to HealthCare Partners Clinic for complaints of severe neck and back pain, pain under arms into ribs, and "left leg not working right".  AR 400.  The Physicians Assistant noted that "[h]e states that the Soma that I gave him back on May 21 only improved his muscle spasm if he took 2 to 3 at a time.  He admits to a past history of narcotic and drug abuse.  Today, he does admit that he smokes marijuana 3 to 4x a week.  He states that this moderately improves his pain."  *Id*.

On August 27, 2010, Plaintiff presented to HealthCare Partners Clinic for complaints of back and neck pain.  The Physicians Assistant noted that "[w]hen I last saw the patient in the clinic recently, he was complaining of left shoulder, neck, wrist pain, and stating he could not move it, however, he is freely moving the left arm today and states now it is only in the left side of his neck.  When I questioned him about his recent pain and neuropathy, the patient states 'his pain moves around all over his neck and back and sometimes it is worse in some places and sometimes it is worse in other places.'" AR 398.

On November 10, 2010, Plaintiff presented to the Pahrump Mental Health Clinic for medication to help with what he described as his chronic and persistent depression.  AR 339.  The notes indicate that Plaintiff reported growing up in an alcohol and drug environment which caused him to begin using drugs and alcohol as a child.  *Id*.  He reported that he had been smoking marijuana since he was about four or five and continued to smoke it on a daily basis.  *Id*.  He also reported that he began drinking at age five, but eighteen months ago he made a decision to significantly change the way he drinks and had since cut back his drinking to occasional drinks in "very small amounts".  *Id*.  Dr. Northrop noted with regard to Plaintiff's mental exam that "[h]e was a well-nourished, appropriately dressed man who was cooperative with the exam.  He endorsed

depression and his affect was consistent with that.  He is frequently weary of life but adamantly denies any plans or intentions of harming himself, or anyone else.  There was no evidence of psychosis.  He was well organized in his speech and thought.  His memory is intact for recent and remote events.  He was alert and oriented.  His insight and judgment are intact and his IQ is considered average." AR 340.  Dr. Northrop also stated that "I do believe that [Plaintiff] would be better served if he discontinued the marijuana and that it might improve his mood over the long term but he is not ready to do that at this time." AR 341.

In a letter from HealthCare Partners dated February 22, 2011, Physicians Assistant, Mr. Ha Le PA-C, stated that Plaintiff's medical condition includes degenerative disc disease of the C-spine and L-spine including neuropathy since 2007.  AR 309.  He stated that, "[p]t has been seen in our clinic but due to financial reasons have [sic] had difficulty with maintaining proper management and care with medication and follow up." *Id*.  He further stated that Mr. Cummins has had significant psychiatric care with Dr. Northrop and Dr. Dupress for diagnosis and treatment of bipolar disorder with depression.  *Id*.  Mr. Le stated that "[i]n my humble opinion, this patient has presented w/ chronic pain and degenerative disc disorder combined w/ his psychiatric disorders that would qualify him for permanent disability." AR 309.

On March 9, 2011, Plaintiff presented to the Pahrump Mental Health Clinic for an appointment.  AR 311.  The nurse indicated that Mr. Cummins had positive reports regarding the change in his medication.  She stated that "[h]e started taking 2mg of Abilify and felt that it helped him with his insomnia.  However, he is still bothered by the interrupted sleep pattern.  He denies any s/s of side effects from this medication.  He reports that he seems to be able to control his temper somewhat better." *Id*.  He was assessed with Major Depressive Disorder and Chronic Panic Disorder without Agoraphobia.  AR 313.

### C. ALJ's Decision

In his May 24, 2011 decision, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act from June 1, 2009, through the date of his decision.  AR 20.  The ALJ found that Plaintiff possessed sufficient residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967.  AR 24.  In reaching this conclusion, the

ALJ followed the five-step process set forth in 20 C.F.R. § 404.1520(a)-(f). First, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from his alleged onset date, June 1, 2009, through his date last insured, December 31, 2012. AR 22. Second, he found Plaintiff had severe impairments in the form of degenerative disc disease of the cervical and lumbar spine without neurological deficit, and major depressive disorder. *Id*. The ALJ considered Plaintiff's alleged impairments of varicocele/testicular cyst and headaches. AR 22-23. He concluded, however, that these impairments did not rise to a "severe" level as defined in the regulations because they did not cause more than minimal functional limitations. *Id*.

At step three of his analysis, the ALJ concluded that Plaintiff's impairment or combination of impairments did not meet or equal one of the listed impairments in 20 C.F.R. § 404, Subpt. P, Appx. 1. AR 22. In support of this finding, ALJ Heyer stated:

> The claimant's mental impairment does not meet or medically equal the criteria of listing 12.04. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. ... Based on an independent review of the evidence of record, both with and without the use of marijuana, I rate the claimant's mental impairment as follows: In activities of daily living, the claimant has mild restriction. The claimant reported good activities of daily living including feeding chickens, cleaning up his property including burning weeds, removing garbage, and growing a garden. He also reported washing dishes, dusting, doing laundry, grocery shopping, walking his dogs 1/2 mile, and using a computer to play games and research about online school programs because he is considering going back to school. ... In social functioning, the claimant has moderate difficulties. Although the evidence documents a longstanding history with anger control issues, the claimant was able to interact appropriately with all of his medical providers. Further, the claimant testified that he takes Abilify, which is effective and his anger problems are now under control. ... Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, the "paragraph B" criteria are not satisfied.

AR 23-24. The ALJ also considered "paragraph C" criteria, but found that the evidence failed to document a history of chronic affective disorder of at least two years duration that has caused more than minimal limitations of the ability to do basic work activities, with symptoms or signs currently attenuated by mediation or psychosocial support. AR 24. The ALJ also found that the evidence failed to demonstrate related episodes of decompensation, a residual disease process that has resulted in marginal adjustment, or a current history of one or more years inability to function outside a highly supportive living arrangement. *Id*.

Before considering step four of his analysis, the ALJ found Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). AR 24. Specifically, the ALJ found that the Plaintiff retained the capacity to lift and carry no more than twenty pounds and is capable of completing an eight hour work day with the option to alternate between sitting and standing positions as needed. *Id*. He also limited Mr. Cummins to work activity that requires no more than minimal interaction with others due to his mental impairment. *Id*. In support of this finding, the ALJ stated,

> [t]he evidence of records shows that the claimant has a longstanding history of back pain and depressive symptoms but that he was able to engage in and sustain substantial gainful activity despite these impairments. ... Although x-rays confirm the claimant has degenerative disease of his cervical and lumbar spine, physical exams and the claimant's good and varied activities of daily living show that the claimant remains capable of performing and sustaining a range of light exertion work.

AR 25. The ALJ noted that the statements of two physicians suggesting that Plaintiff may have exaggerated his symptoms and limitations; that Plaintiff testified that he smoked marijuana three times a day in lieu of following his prescribed treatment; and that Plaintiff was currently looking for jobs that did not require a lot of bending and lifting, supported his RFC assessment. AR 26-27. The ALJ also found that the objective medical evidence did not support a disabling mental impairment because "treatment records show that his symptoms respond well to Abilify and do not prevent all work activity... [and] the claimant testified that working helps control his mental state." AR 26. Accordingly, the ALJ found that a restriction to only minimal contact with people at work fully accommodated the Plaintiff's mental impairment. AR 27.

At step four of his analysis, the ALJ found that the Plaintiff was incapable of performing his past relevant work as a welder and bulk loader. AR 28. At step five, after considering the Plaintiff's age, education, work experience, and residual functional capacity in conjunction with the Medical-Vocational Guidelines, the ALJ found that the Plaintiff could perform other work. *Id*. In support of this finding, the ALJ relied on the testimony of Vocational Expert ("VE") Robin L. Generaux. The ALJ stated:

. . .

. . .

> If the claimant had the residual function capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.18. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. At the Administrative Hearing, Robin Generaux, a vocational expert, was asked to respond to a hypothetical question to determine the extent to which these limitations erode the unskilled light occupational base... The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative light exertion occupations such as order clerk, bench worker, and sorter.

AR 29.

The ALJ further stated:

> Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy. Ms. Generaux explained that the Dictionary of Occupational Titles does not discuss the sit/stand option but that she has more than twenty-five years of experience in field [sic] that provides the expertise to discuss jobs that permit the sit/stand option.

AR 29. Based on the testimony of the vocational expert, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. AR 30.

## DISCUSSION

### I.   Standard of Review

A federal court's review of an ALJ's decision is limited to determining only (1) whether the ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper legal standards. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). The Ninth Circuit has defined substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001). The Court must look to the record as a whole and consider both adverse and supporting evidence. *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Where the factual findings of the Commissioner of Social Security are supported by substantial evidence, the District Court must accept them as conclusive. 42 U.S.C. § 405(g). Hence, where the evidence may be open to more than one rational interpretation, the Court is required to uphold the decision.

*Moore v. Apfel*, 216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)). *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The court may not substitute its judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the ALJ's decision. *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

It is incumbent on the ALJ to make specific findings so that the court need not speculate as to the findings. *Lewin*, 654 F.2d at 635 (citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974)). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.     Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that:

(a)   he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and

(b)   the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A).

The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful work that exists in the national economy. *Batson*, 157 F.3d at 721.

### III. Analysis of the Plaintiff's Alleged Disability

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any point during the process, then no further assessment is necessary. 20 C.F.R. § 404.1520(a). Under the first step, the Secretary determines whether a claimant is currently engaged in substantial gainful activity. *Id.* § 416.920(b). If so, the claimant is not considered disabled. *Id.* § 404.1520(b). Second, the Secretary determines whether the claimant's impairment is severe. *Id.* § 416.920(c). If the impairment is not severe, the claimant is not considered disabled. *Id.* § 404.152(c). Third, the claimant's impairment is compared to the "List of Impairments" found at 20 C.F.R. § 404, Subpt. P, App. 1. The claimant will be found disabled if the claimant's impairment meets or equals a listed impairment. *Id.* § 404.1520(d). If a listed impairment is not met or equaled, the fourth inquiry is whether the claimant can perform past relevant work. *Id.* § 416.920(e). If the claimant can engage in past relevant work, then no disability exists. *Id.* § 404.1520(e). If the claimant cannot perform past relevant work, the Secretary has the burden to prove the fifth and final step by demonstrating that the claimant is able to perform other kinds of work. *Id.* § 404.1520(f). If the Secretary cannot meet his or her burden, the claimant is entitled to disability benefits. *Id.* § 404.1520(a).

Plaintiff asserts that the ALJ improperly considered vocational evidence because it conflicted with the Dictionary of Occupational Titles. He also argues that the ALJ erred in finding that the jobs proffered by the vocational expert are available in significant numbers in the area in which he resides. Additionally, Plaintiff submitted new evidence to the Court to support his claim

of disability, which was not provided to the ALJ or the Appeals Council when making their decision. In analyzing Plaintiff's case, the Court must first determine what evidence can be considered and for what purpose it can be considered.

### A. The new evidence submitted to the Court is not material because it would not have changed the outcome of the administrative hearing

Plaintiff argues that the Court should reverse the ALJ's decision because new medical evidence about the severity of his disorder was not considered. Under sentence six of section 405(g), the court "may at any time order additional evidence be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. *See* 42 U.S.C. § 405(g). In *Mayes v. Massanari* 276 F.3d 453, 462 (9th Cir. 2001), the Ninth Circuit held that for new evidence to be material under section 405(g), the new evidence must bear directly and substantially on the matter in dispute. Additionally, Plaintiff must demonstrate that there is a reasonable possibility that the new evidence would have changed the outcome of the administrative hearing. *Id*. To demonstrate good cause, Plaintiff must demonstrate that the new evidence was unavailable earlier. *Id*.; *see also Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (If new information surfaces after the Secretary's final decision and the claimant could not have obtained that evidence at the time of the administrative proceeding, the good cause requirement is satisfied).

The new evidence at issue consists of a medical referral from Dr. Bady with Advanced Orthopedics & Sports Medicine and the accompanying MRI results from Desert View Regional Medical Center. *See Dkt. #37*. In his motion, Plaintiff states that due to the new healthcare act he was able to obtain medical care that was previously unattainable. *Id.* He represented that he was referred to a pain management specialist for injections in his spine and is set to see a physical therapist for further tests and evaluations. *Id.* The attached referral from Dr. Bady states that Plaintiff was referred for an MRI of his lumbar spine and was referred to Dr. Mohajer for pain management. *See Dkt. #37* at pg. 4. Further, the attached x-ray findings and conclusions from Desert View Regional Medical Center indicate that Plaintiff's cervical spine showed "moderate lower cervical degenerative change," x-rays of his thoracic spine showed "slight multilevel

degenerative change," and x-rays of his lumbar spine showed "no evidence of acute osseous abnormality." The Discharge/Exit Care Patient Information attached to the findings and conclusions stated that Plaintiff has Chronic Back Pain. *See Dkt. #37* at pg. 8-10. The forms noted home care instructions which included avoid bending, heavy lifting, prolonged sitting, and activities which make the problem worse; taking brief periods of rest throughout the day to reduce pain, (lying down or standing usually is better than sitting while you are resting); and taking over-the-counter or prescription medicines only as directed. *Id*. Plaintiff was prescribed Flexeril and Norco. *Id*. The new evidence, however, made no reference to Plaintiff's condition prior to April 14, 2014, the date the new tests were conducted.

The Social Security Act requires that a disability be continuously disabling from the time of onset during insured status to the time of application for benefits, if an individual applies for benefits for a current disability after the expiration of insured status. *See Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1460 (9th Cir. 1995). The criteria for "insured status" are set forth at 42 U.S.C. § 423(c) and related regulations. Plaintiff's insured status ended on December 31, 2012. Although a claimant may establish such continuous disabling severity by means of a retrospective diagnosis, a claimant is not entitled to disability benefits unless he can demonstrate that his disability existed prior to the expiration of his insured status. *See Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1461 (9th Cir. 1995). Deterioration in a claimant's condition subsequent to expiration of her insured status is irrelevant. *Id*.

The principles set forth in *Flaten* are dispositive of this issue. The medical referral from Dr. Bady with Advanced Orthopedics & Sports Medicine and the accompanying MRI results from Desert View Regional Medical Center (#37) reflect Plaintiff's condition as of April 14, 2014, rather than Plaintiff's condition during the time period relevant to this appeal. The new records fail to establish that Plaintiff suffered from a disability prior to December 31, 2012. The Court therefore finds that these medical records would not have changed the outcome of the administrative hearing.

. . .

. . .

. . .

### B. The ALJ did not err at step five in considering vocational evidence that conflicted with the Dictionary of Occupational Titles

Plaintiff argues that the ALJ improperly considered the vocational evidence because it conflicted with the Dictionary of Occupational Titles. Specifically, the ALJ found Plaintiff capable of completing an eight hour work day with the option to alternate between sitting and standing positions as needed. AR 24. Given this hypothetical, Vocation Expert Generaux stated that Plaintiff was capable of performing the requirements of representative light exertion occupations such as order clerk (DOT 249.362-026), bench worker (DOT 713.684-018), and sorter (DOT 529.687-186). AR 29. Plaintiff argues that the ALJ incorrectly found him capable of performing the jobs referenced by Ms. Generaux because the DOT does not indicate that those jobs could be performed with the stand/sit limitation.

Social Security Regulation ("SSR") 00-4p provides that "[w]hen a vocational expert provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that vocational expert evidence and information provided in the Dictionary of Occupational Titles." SSR 00-4p further provides that the adjudicator will ask the vocational expert if the evidence he or she has provided is consistent with the Dictionary of Occupational Titles and obtain a reasonable explanation for any apparent conflict. The procedural requirements of SSR 00-4p ensure that the record is clear as to why an ALJ relied on a vocational expert's testimony, particularly in cases where the expert's testimony conflicts with the Dictionary of Occupational Titles. *See* SSR 00-4p.

In making disability determinations, the Social Security Administration relies primarily on the DOT for information about the requirements of work in the national economy. *See Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). The Social Security Administration also uses testimony from vocational experts to obtain occupational evidence. *Id*. Although evidence provided by a vocational expert generally should be consistent with the DOT, neither the DOT nor the vocational expert's evidence automatically trumps when there is a conflict. *Id*. Thus, the ALJ must first determine whether a conflict exists. If it does, the ALJ must then determine whether the vocational expert's explanation for the conflict is reasonable and whether a basis exists for relying

on the expert rather than the Dictionary of Occupational Titles. *See* SSR 00-4p.

In *Johnson v. Shalala*, 60 F.3d 1428, 1435 (9th Cir. 1995), the Court held that an ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to support the deviation. *See also Buckner-Larkin v. Astrue*, No. 09-17751, 450 Fed.Appx. 626-629 (9th Cir. Sept. 20, 2013) (finding that it was enough that "[t]he vocational expert noted that although the DOT does not discuss a sit-stand option, his determination was based on his own labor market surveys, experience, and research"). Here, the ALJ specifically noted the vocational expert's conflicting testimony and reasonably explained the discrepancy. He stated:

> Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy. Ms. Generaux explained that the Dictionary of Occupational Titles does not discuss the sit/stand option but that she has more than twenty-five years of experience in the field that provides the expertise to discuss jobs that permit the sit/stand option.

AR 29. The Court therefore finds that the ALJ provided substantial evidence to support his decision to consider the vocational evidence that conflicted with the Dictionary of Occupational Titles.

### C.   The ALJ did not err in finding that a significant number of jobs existed in the national economy

Plaintiff argues that the jobs proffered by the vocational expert are not available in significant numbers in the area in which he resides. He therefore alleges that he is entitled to an award of disability benefits. Pursuant to 20 C.F.R. § 404.1566(a), the Commissioner considers that "work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country." It further provides that "[i]t does not matter whether (1) work exists in the immediate area in which you live; (2) a specific job vacancy exists for you; or (3) you would be hired if you applied for work." *Id*. Whether there are a significant number of jobs a claimant is able to perform with his limitations is a question of fact to be determined by a judicial officer. *See Martinez v. Heckler,* 807 F.2d 771, 775 (9th Cir. 1986). Therefore, the Court must uphold the ALJ's decision if it is supported by substantial evidence,

which is a highly deferential standard of review. *See Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

Here, the ALJ noted the vocational expert's findings that there were 18,454 jobs in the United States and 151 jobs in Nevada for order clerks, 84,285 jobs in the United States and 489 jobs in Nevada for bench workers, and 124,889 jobs in the United States and 505 jobs in Nevada for sorters. AR 29. While Plaintiff disputes his ability to travel to find work in other parts of the country, the ALJ did not have to establish that a significant number of jobs existed in the immediate area in which the Plaintiff lives. *See* C.F.R. § 404.1566(a). Therefore, the Court finds that the ALJ's determination that the number of jobs identified by the vocational expert was significant is supported by substantial evidence, and consistent with precedent. *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009) (noting that as few as 174 jobs has been held to be significant); *see also Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997) (holding that the existence of 200 jobs in the regional economy was a clear indication that other substantial gainful work existed in the national economy); *see also Uravitch v. HecklerI,* No. Civ-84-1619-PHX-PGR, 1986 WL 83443, at 1 (D.Ariz. May 2, 1986) (holding that 125 to 240 tune-up mechanic positions the claimant was capable of performing constituted a significant number as that term is used in the Secretary's regulations).

## **CONCLUSION**

ALJ Heyer's decision that Plaintiff has the residual functional capacity to perform light work with limitations is supported by substantial evidence in the record. In determining Plaintiff's RFC, he properly provided specific and legitimate reasons, supported by substantial evidence in the record for giving little weight to Mr. Le's opinion. In addition, he set forth sufficient reasons in his decision for rejecting the credibility of Plaintiff's testimony regarding the severity of his impairments and his alleged inability to perform light work. Furthermore, ALJ Heyer did not err in considering vocational evidence that contradicted the Dictionary of Occupational Titles or in finding that a significant number of jobs which Plaintiff could perform existed in the national economy.

. . .

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Reversal (#28), Plaintiff's second Motion for Reversal (#35), Plaintiff's third Motion for Reversal (#37), and Plaintiff's Motion of Understanding (#40) be **denied**, and that the Defendant's Cross Motion to Affirm (#29) be **granted**.

## NOTICE

Under Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. Appeals may been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). Failure to file objections within the specified time or failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 12th day of September, 2014.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge